UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re:
OLD ABE COMPANY,
     Debtor.                       No. 11-04-15468 SA

## MEMORANDUM OPINION ON CLAIMS OF LEONARD JENSEN

The claim of Leonard Jensen ("Jensen") came before the Court on September 7-9 and September 21, 2005 for a merits hearing on the objection of the debtors in possession Old Abe Company (doc 33) and Lincoln Gold and Tungsten, Inc. (doc 37) and the response thereto (doc 46 in both cases). After considering the evidence and the arguments, the Court grants in part and denies in part the claim objection. This is a core proceeding. 28 U.S.C. § 157(b)(2)(B).[1]

## Procedural History

On July 27, 2004, the debtors in possession Old Abe Company ("Old Abe") and Lincoln Gold and Tungsten, Inc. ("Lincoln") commenced their chapter 11 cases, 11-04-15468 and 11-04-15469 respectively. Jensen promptly filed a proof of claim in each case (claim no. 1 in the Old Abe case and claim no. 2 in the Lincoln case).[2] Old Abe and Lincoln objected to the claims (docs

---

[1] All statutory references are to the Bankruptcy Code as it existed before the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

[2] Early in each case, Jensen moved for stay relief in order to complete a state court adjudication of his claims against the debtors. After the bankruptcy cases were ordered to be jointly administered, the Court denied Jensen's motions for stay relief.
(continued...)

33 and 37 respectively) and Jensen responded (doc 46 in both cases). Subsequently the cases were ordered jointly administered (docs 66 and 63 respectively) and have been continued to be administered under the style and number of the Old Abe case.

**Factual History**

On March 23, 2001, Jensen and Carl Dotson ("Carl") as president of Old Abe and of Lincoln ("Lessors", "Corporations", "Debtors") executed the Letter of Agreement between Jensen and the Debtors ("Lease" – Jensen exhibit 1) effective retroactively to March 1, 2001.

The Lease required payment of an annual advance royalty of $50,000. It also required royalty payments of 10% of the fair market value of the sand, gravel and rock removed or sold[3], and 12% of any gold produced, to be credited against the $50,000. ¶¶ I[4] and K.[5] An addendum to the Lease ("Addendum") imposed

---

[2](...continued)
Doc 95.

[3] For material processed from the mine dumps, the royalty was 15% on sand, gravel, rock and non-mineral byproduct. ¶ J.

[4] Paragraph I provides in full as follows: "Annual advance royalty per annum of $50,000.00 shall be due and payable upon notice of exercise of option, and a condition thereof. Lessors acknowledge receipt of nonrefundable deposition [sic] on first year annual advance royalty, and by these presents acknowledge receipt of the first year annual advance royalty on date of execution hereof, which date will not vary effective dates and term of the lease as set out herein. Lessee shall pay monthly to Lessor 10 percentum (10%) of fair market value of all production from operations consisting of commercial sand, gravel
(continued...)

Page 2 of 74

different and more specific conditions for keeping track of the
gold and for measuring it and distributing it in kind each month.
Jensen exhibit 1 (first page).  Jensen was required to report the
production monthly.  ¶ I.

The Lease identifies the sites covered by the Lease, and
gives Jensen the right to mine, process and sell sand, gravel,
rock and minerals, including specifically gold.  ¶ A.  Jensen was
entitled to use water from the Old Abe well and pipeline but had
to pay the electricity costs.  ¶ E.  He was also required to pay
the costs of maintenance and replacement of the pumps and
pipeline.  ¶ E.  The Lease required Jensen to install certain
equipment necessary to conduct operations.  ¶ C.  Jensen was also
required to purchase the mining equipment already on the site

---

⁴(...continued)
and rock as sold by cubic yardage, or ton as removed, or sold,
from stockpiling and production of placer material under the
lease, and 12 percentum (12%) of any byproduct minerals resulting
from the milling process and any operations conducted by Lessee
on the leased lands and interests, not later than the 15th of
each month for the preceding month, and shall report production
monthly in forms as Lessors may request."

⁵ The Lease describes the annual $50,000 as "advance
royalty", ¶¶ I and K, and "non-refundable".  ¶ K.  The Court
interprets this language to mean that the $50,000 paid each year
is a credit on the royalty payments owed for that year.

that belonged to previous lessees. ¶ N.[6] And he was required to process at least 30,000 yards of material per year. ¶ H.

The Lease term was one year, until March 1, 2002, renewable each year for nine years. In order to renew, Jensen was required to provide written notice to Debtors no later than January 15, and to be current on all the Lease obligations. ¶ H. Failure to renew timely or to pay any royalty within thirty days of its due date were two conditions which would result in automatic termination of the Lease on March 1. ¶ M.[7]

The production stockpiled on site and all of Jensen's equipment comprised collateral to secure payment of any defaulted payments, and termination of the Lease entitled Lessors to

---

[6] Paragraph N also provided for Jensen's purchase of Lincoln's stock, but those arrangements were independent of Jensen's lease obligations described above, and in event never went into effect.

[7] Paragraph M provides in full as follows: "This Lease expires on March 1, 2002, or any extension year and is automatically terminated upon such expiration, or if Lessee permit any lien recorded against the lease, production or equipment to remain attached for 90 days following attachment thereof, or if Lessee have failed to pay when due any royalty provided hereunder, for a term of 30 days after due date, or failed to meet any requirement herein for providing notice of extension under terms hereof. On date of termination, all production stockpiled on site and all equipment shall become security for any sums unpaid under the lease, and be disposable by Lessor in satisfaction of any sums due it, and all production and equipment of Lessee on the site shall be subject to such security interest from commencement hereof. Provided, if all sums due are paid current at time of expiration or termination of this lease, Lessee shall have not to exceed 60 days within which to remove equipment, after which all property remaining will become the property of Lessors."

dispose of the production and equipment to pay the debts. If Jensen were to be current when the Lease expired, he would have sixty days to remove his equipment. Afterwards any "property" (which the Court reads to include equipment and production) would become property of Lessors. ¶ M. (However, given the provisions of the Addendum for dividing the gold on a monthly basis, the production remaining on the site would have presumably have been only sand, gravel and rock, had the parties complied with the Addendum.)

Upon execution of the Lease on March 23, Jensen paid $25,000 cash to Lessors (Jensen exhibit 26) and executed a promissory note for the remaining $25,000 (Jensen exhibit 13, at 2). The note had a due date of May 7, presumably for calendar year 2001.

Jensen, by himself and with others, worked hard to get the mining operation up and running. He reached agreements for the requisite equipment: the purchase of Jim Niebaum's equipment on April 10, 2001 (Jensen exhibit 7), the assumption of the lease with First Banks, Inc. of Niebaum's leased equipment on July 20, 2001 (Jensen exhibit 2), and the lease of equipment from Citicapital on November 27, 2001 (Jensen exhibits 6 and 17, ¶¶ 3 and 10). (Citicapital and First Banks, Inc., fka First Capital Group, are collectively identified as "Equipment Lessors"). He purchased some of his own equipment.

Case 04-15468-s11    Doc 303    Filed 10/13/06    Entered 10/13/06 14:43:48 Page 5 of 74

Jensen and his crew also struggled constantly to keep some of the equipment, including the water pump, functioning.  Indeed, according to Jensen and Don Keller ("Keller"), the equipment was in such poor shape that he spent until October 2001 just repairing and trying to operate the equipment[8]; during this time he produced no product.

Jensen consulted frequently with Carl Dotson about the status of the operations and production.  He heeded Carl's advice about where there might be gold, and hired Wayne Holland as recommended by Carl to help find veins of gold.

Unfortunately for Jensen, he was so undercapitalized from the start and thereby also unable to afford adequate equipment that by March 2002 he was behind in his payments and had produced relatively little sand, gravel, rock or gold.  Jensen testified that he had sold maybe $1800 to $2000 worth of sand and gravel by the end of February 2002.  In particular, Jensen never payed any portion of the $50,000 advance royalty for 2002-03.

Jensen asserted that he maintained production records in a book that Carl's son David Dotson ("David") took out of the office trailer[9] before a meeting the two of them participated in

_____

[8] Earl Clark also testified to the poor condition of all the equipment and the continuing effort to get and keep it functioning.

[9] At the White Oaks site there were at least two "house" trailers: one for whomever was operating the site, as provided in
(continued...)

on July 14, 2002.  The Lease required the delivery of production reports to Lessors on a monthly basis.  Lease, ¶ I.  There is no evidence that Jensen ever did that.  Maintaining those records in the office was not the equivalent of delivering the reports.[10]

On or around March 27, Jensen met with Carl, who did a summary accounting of at least some of what Jensen owed.  Jensen exhibit 13.  At that time Jensen still owed the entire $25,000 note plus interest at 10% for the year since the note was executed ($2,500), together with some overdue electricity bills.  The accounting does not list anything due for whatever product had been produced or sold.  However, it also has a notation "1 yr Lease Option Ext. 50,000.00", which is added to the note obligation ($27,500) and electricity bills ($779.36) to total $78,279.36.

---

[9](...continued)
¶ G of the Lease, which also served as the office, and one for Carl.  In addition, there was a storage unit on the site, the size of a shipping container.  It was into this storage unit or trailer that Jensen moved a safe in May 2002.  And apparently there were one or more "van trailers" at the site as well.

[10] Nor did he ever provide any sales reports to Lessors.  In his deposition taken by White Oaks Resources, Jensen stated that the reports of all sales were in the office of his attorney.  Transcript of May 18, 2005 ("Tr."), p. 42, ll. 10-14.  Some sales records were produced at trial (Jensen Exhibit 32 and Lessors Exhibit E).  The Court finds that, practically speaking, Jensen did not maintain or deliver to Lessors any sales records on a monthly basis.  Nothing in the Lease specifically requires sales reports as such; however, the parties spent time litigating this issue.

The figure for the electricity bills starts with a notation at the top of "Mar. 01" and runs down to "Jan. 02", for a total of $587.35.[11]  Added to that figure is $74.97 for "Feb. 02", for a total of $662.32 labeled "For year".  Added to that total in turn is $117.04 labeled "Mar 02", with a final total of $779.36. Thus the electricity bills appear to include what was due for the first lease year plus one month of a second lease year.

Entries on the accounting sheet show that Jensen paid the entire electricity bill ($779.36) and $4,000 on the note that day.  The attached promissory note records that payment, and another $15,000 payment on April 3, 2002.  However, there is no evidence of any additional payments after those dates, for any purpose.

Although Jensen testified that he was prepared at various times to tender whatever sums were owed, and that he had sources of funding to do so, there was no concrete evidence that Jensen ever had the money in hand to make those payments.  (This comment applies with particular force to the $50,000 advance royalty for

_____

[11] There are only nine entries, although March - January is eleven months.  It is possible that one or more of the numbers that appears in that column might represent a bill that included the unpaid balance from a previous (unlisted) bill.  It is also possible that there were no bills for two months because of reduced operations in the late fall or early winter 2001-02.) Keller testified that he stopped working the first week in December because it got too cold and did not return until February 2002.  Neither party tendered into evidence either the electricity bills themselves or evidence of the utility's billing cycle.

Case 04-15468-s11    Doc 303    Filed 10/13/06    Entered 10/13/06 14:43:48 Page 8 of 74

2002-03.) Jensen's explanation that he had the funds at various times but used them for other business purposes because they were not needed at the particular moment in question proves if anything that he never had the money. That conclusion is reinforced by the essentially uncontested testimony from David about meetings that Jensen would show up for without his checkbook.

As Carl's health worsened, David became more involved in dealing with Jensen on behalf of the Lessors. Over April, May and June 2002, a series of meetings were arranged between Jensen on the one hand and Carl and/or David on the other hand, to resolve the situation. Jensen attended some of these meetings, sometimes without his checkbook, and missed others, at first with explanations delivered beforehand and then with no explanations.

In June and July 2002, three events transpired. Carl, whose health had rapidly deteriorated, died on June 26. Thereupon David took direct charge of the dealings with Jensen. Also on June 26, Don Klein ("Klein"), Lessors' attorney issued a letter for delivery to Jensen essentially declaring Jensen to be in default under the Lease and making certain resulting demands. One effect of the letter was that Lessors locked Jensen out of the site. Third, after certain aborted meetings, on July 14, 2002, David and his cousin Harold Dotson ("Hal") met with Jensen

Case 04-15468-s11    Doc 303    Filed 10/13/06    Entered 10/13/06 14:43:48 Page 9 of 74

and Don Keller at the White Oaks site, and effectively ended the Lease to the extent it had not already been terminated.

While there is agreement on the broad outlines of what happened at the White Oaks meeting on July 14, there is disagreement on certain details. The witnesses agree that the Dotsons, Jensen and Keller went first to look at the piles of aggregate and discussed (and disagreed about) measuring them and what the measurements signified. They also agree that they then went to the storage trailer on site to open a safe to look at the gold that had been produced. Jensen had brought the safe onto the site in about May 2002, and had stored in it specimen gold and the vials of gold dust and nuggets processed from the operations. They agree that the lock had been cut off the storage trailer by someone. They also agree that the safe appeared to have been tampered with, and that Keller opened the safe using the combinations for two or more of the four combination locks. But upon the safe doors swinging open, in a plot twist worthy of a Dashiell Hammett novel, some of the gold was discovered to be missing. Each side purported to be surprised to discover the gold to be missing (although Hal characterized his reaction as more disgusted than surprised), and Keller and/or Jensen and/or David supposedly cried out, "The gold is missing!" The safe was then closed up, and the parties went back to the office trailer.

Page 10 of 74

At the trailer, a heated discussion took place. Jensen and Keller testified that Jensen tendered payment for the balance of the note and for part if not all of the advance royalty for the 2002-03 lease renewal, but that David said that even if Jensen wrote a check for $200,000 he would not accept it, and gave him five minutes to leave the premises for good. David and Hal deny that the tender was made, and also deny the $200,000 comment. They do not dispute that Jensen was told the Lease had been terminated and he needed to vacate the premises. Jensen and Keller gathered up some of their personal belongings and left the site.

During this time period David brought to the White Oaks site certain equipment of Jensen's (a grader and a front-end loader). This was done at the request of a land owner on whose property it had been left, according to Rip Tate, but it coincidentally (or perhaps not so coincidentally) had the effect of bringing that equipment within Lessors' fenced premises. David had repairs made to Jensen's dump truck and titled it in his name. The pickup was sold to a Gary Vega. And the front-end loader remained at the site. The Equipment Lessors subsequently sued Jensen who, having no ability to pay and no defenses that would be valid against the Equipment Lessors, agreed to the entry of judgments against him. Jensen testified that he sought legal counsel shortly after the July 14 meeting, but did not take any overt

action to regain possession any of the equipment including the vehicles.  Instead, when sued by Citicapital and First Banks, he agreed to a judgment and filed a third-party claim over against Old Abe, Lincoln and David.  That litigation progressed until the bankruptcy petitions were filed.

**Analysis**

The Lease

The Lease, including the Lease Addendum, is a mineral interest lease, and is therefore treated not as a standard landlord-tenant relationship but as a conveyance of real property.  Barela v. Locer, 103 N.M. 395, 398-99, 708 P.2d 307, 310-11 (1985); Vanzandt v. Heilman, 54 N.M. 97, 108, 214 P.2d 864, 870 (1950); Staplin v. Vesely, 41 N.M. 543, 72 P.2d 7, 8 (1937); Terry v. Humphreys, 27 N.M. 564, 203 P. 539, 543 (1922).  As such, the Lease is subject to the rules for construing contracts that convey an interest in land.  Vanzandt v. Heilman, 54 N.M. at 110, 214 P.2d at 872; Richard Lord, 17 Williston on Contracts § 50:57 (4th ed. 2005) ("Once it has been determined that there is a valid mineral lease, the courts will apply the basic fundamentals of contract law to determine the rights and liabilities of the parties.").  "Generally, the lessor has the burden of proving the cancellation of a mineral lease."  Maralex Resources, Inc. v. Gilbreath, 134 N.M. 308, 312, 76 P.3d 626, 630 (2003).  (Internal punctuation and citation omitted.)

Case 04-15468-s11   Doc 303   Filed 10/13/06   Entered 10/13/06 14:43:48 Page 12 of 74

The Lease is relatively clear in specifying the obligations imposed on Jensen. Jensen met some of those requirements. For example, he paid the full $50,000 advance royalty for the first year of the lease, by means of the $25,000 cash payment and the $25,000 promissory note. The Court notes that the Lessors and even Jensen seemed to regard the non-payment of the note as a remaining Lease payment obligation, but it was not. Jensen's non-payment on the note constituted a remaining obligation on the note, not on the Lease. So once the Lessors accepted the advance royalty payment in the form of cash and a note, Jensen had complied with the advance royalty payment for the first year.

Jensen also installed equipment or purchased the equipment on site, and sought to get it all running so that he could produce as required by the Lease. He also used and maintained the water lines and pumps. He did pay the electricity bills, albeit late.

In a number of other respects, however, Jensen did not comply with the requirements of the Lease. As of February 28, 2002, Jensen was not in strict (or even not-so-strict) compliance with the requirements in the Lease to renew it. So the question arises whether Carl waived some or all of the conditions for renewal. Since nothing in the Lease requires the waiver of any conditions to be in writing, the Court must determine from the

parties' conduct what if anything was waived.  (This analysis
bears also on Jensen's assertion of promissory estoppel.)

Concerning the renewal of the Lease for another year, Jensen
never provided written notice of his intent to extend the Lease,
either by the deadline of January 15, 2002, or any time later.
There is no evidence whatever that Jensen made any tender of the
$50,000 before March 1, 2002.  Nor did he in reality tender the
$50,000 afterward.  The evidence was clear that Jensen never had
the funds to back up any offer to pay $50,000.

Jensen correctly cites the requirements for a valid tender:
an offer to perform coupled with the present ability to perform,
so that the obligation could be satisfied but for the other
party's refusal to cooperate.  Naumberg v. Pattison, 103 N.M.
649, 653, 711 P.2d 1387, 1391 (1985).  Based on this definition,
Jensen never "tendered" the payment because he never had the
ability to pay the $50,000.

The Court finds that Carl never waived payment of the second
$50,000 annual advance royalty.  That much at least is quite
clear, and all by itself probably constitutes all that needs to
be said about waiver.  Nevertheless, the Court will consider what
other requirements Carl did or did not waive, since those facts
bear on the disposition of the claims.

Jensen argues that Carl and Jensen nevertheless extended the
Lease by the writing which is marked as Exhibit 13.  Jensen also

argues that Carl waived Jensen's lease defaults (effectively continuing the Lease), and that in any event Carl's behavior led Jensen to reasonably rely on his right to continue his operation on the property.

Exhibit 13 was an accounting by Carl, who represented the Lessors, of what were Jensen's larger outstanding financial obligations – the note and the electricity bills – together with what it would cost were Jensen to be allowed to renew the Lease for another year. That accounting did not include the additional royalties that Jensen owed for gravel sold or for gold produced; alternatively, regarding the gold, it did not take into account the lack of dividing and distributing the gold as required by the Addendum. Why those additional figures were not included is not clear; it is most likely that the unpaid note (10 ½ months overdue) and the unpaid electricity bills (which Lincoln was paying out of pocket – see Exhibit 27, check 9036) were immediately concrete numbers for Carl that needed to be dealt with. And if Carl were faced with a request by Jensen to continue working the Lease, given that Jensen had spent nearly all his resources (capital, time, labor of himself and acquaintances) just getting the operation up and running the first year, it would also be likely that Carl would put in writing the additional $50,000 that Jensen would need to come up with to extend the Lease.

The lack of any mention of the non-monetary defaults is not surprising, if the purpose of the accounting was to arrive at the dollar figures Jensen owed or might owe. Less clear is why the unpaid royalty payments do not appear in the exhibit. It is likely that the production had been so minimal that Carl considered the pre-March 1 production covered in full by the $50,000 advance royalty payment.[12] Since the amounts owed from March 1 onward would be relatively small for sand, gravel, rock and gold, and since it is likely that Carl was keeping close track of whatever gold was produced, it is also likely that Carl considered these additional royalty payments to amount to not very much or to be easily calculated depending on the latest production. Or perhaps Carl simply did not consider the unpaid royalties as urgent as the other outstanding bills. Thus not including the outstanding royalty obligations (in money's worth or in kind) on the accounting does not constitute evidence that Carl waived those requirements. On the other hand, given his frequent presence at the White Oaks site and his frequent monitoring and consultation about gold production, it appears that Carl did waive the requirement of monthly reports.

What is clear, in any event, is that Exhibit 13 does not in itself constitute Lessors' agreement to renew the Lease, nor does

---

[12] This would have been the correct factual and legal conclusion.

it constitute evidence of such. The fact that there were subsequent entries made on the document argues in favor of it being an accounting rather than a final statement of the parties' contractual agreement. Nothing in the accounting states that the Lease is being renewed. Neither party signed the document. The accounting is so utterly different from the (relatively) detailed documentation that is the Lease and the Addendum, that it is extremely unlikely that Carl Dotson would ever have conducted business this way.

Whether measuring from January 15, 2002, or from March 1, 2002, until at least the White Oaks Miners' Days Fair (the weekend of April 20-21, 2002), Carl had plenty of time to have obtained the execution of a written extension with Jensen if extending the lease was what Carl intended to do. No written extension was executed. And Carl had previously shown his flexibility in working out a financial arrangement that would allow Jensen to comply with the Lease; i.e., taking half of the $50,000 payment in the form of a note instead of cash. Carl also did not do that. The implication of those facts must be that Carl did not execute, and did not mean to execute, an extension of the Lease.

It should be noted that there is some evidence that might be construed as Carl's consent to a renewal of the Lease for another year. Jensen made two payments on the note on March 27 and on

April 3.  But Jensen's making those payments does not change the conclusion that the Lease was not extended because these were obligations arising from the note, which Jensen was obligated on regardless of the termination of the Lease.  It is also the case, and somewhat odd, that Jensen seems to have paid for a month of electricity for the new lease period.  Jensen and Carl may have agreed that Jensen pay this bill as well if Jensen were going to continue to operate for a while.  An alternative explanation may be that Jensen offered to pay that bill as a way of making or keeping Carl happy in the same way he did with his offer to Carl to hunt elk on Jensen's land in Chama.  But the significance of the payment of that one bill, even coupled with Jensen's remaining on the site after February 28, 2002, pales when compared with the contrary evidence. In any event, the notation on Exhibit 13 by itself is too ambiguous to carry the weight that Jensen puts upon it.

Arguably the strongest evidence Jensen has on this issue is that Carl did not tell Jensen to get off the property on March 1, 2002.  It seems clear Carl did not do any such thing, at least until he allegedly instructed David to go to Klein's office and have him issue the letter announcing the termination of the Lease.  (Whether Carl issued that instruction makes little difference for this analysis.)  The Debtors cited the June 26, 2002 letter from Klein, and particularly its wording, as evidence

that Carl had decided that the Lease had been terminated for
nonperformance and to notify Jensen that he had to leave.  David
also testified that on his deathbed Carl told David to go to
Klein and have him send the letter that Carl had had Klein
already prepare.  The Court has some doubt whether Carl ordered
the letter to be sent, or whether it was David's rather than
Carl's instruction that generated the letter.  On this point no
one produced Klein, who might have been able to shed some light
on this issue, including specifically when he was first told to
prepare the letter, and by whom.  And without Klein, the Court
also has some doubt about the significance of some of the
wording.  It could be, for example, that the omission of any
mention of the April 3 payment from the letter either reflected
that Carl had given Klein instructions sometime before April 3 to
prepare the letter, as the Debtors contend, or that Klein and/or
David were unaware or forgot about the April 3 payment when and
if David instructed Klein to prepare the letter.

However, questions about the authorizing of the letter and
its details are somewhat academic.[13]  David effectively, and then
formally as of June 29, succeeded Carl as the executive officer
of the Debtors.  So, whether it was Carl or David who issued the

---

[13] The argument is not entirely academic; were it the case
that Carl instructed David to have the letter sent, it would
provide additional support for the contention that Carl did not
consider that he had bound the Lessors for an extension of the
lease through February 2003.

Case 04-15468-s11   Doc 303   Filed 10/13/06   Entered 10/13/06 14:43:48 Page 19 of 74

instructions to Klein, it was the Debtors who acted through that
letter.  The letter constituted notice that the fence sitting was
over; the Lessors were telling Jensen that his rights to operate
under the Lease were terminated.  And in fact the letter made
explicit what had already happened effective March 1, 2002, by
the terms of the Lease.  At a minimum, when Jensen failed to the
$50,000 to renew the Lease, he triggered the termination of his
right to operate after February 28.[14]

Once the Lease was terminated automatically by Jensen's
failure to perform, it could not be revived.  Greer v. Salmon, 82
N.M. 245, 251, 479 P.2d 294, 300 (1970).  See also Jupiter Oil
Co. v. Snow, 819 S.W.2d 466, 468 (Texas 1991)(A mineral lease is
a fee simple determinable estate in the realty.  The grantor
retains a possibility of reverter.  Upon termination of the
lease, the grantor's possibility of reverter becomes a present
possessory interest.)  Reversions happen automatically and arise
by operation of law, not by any act of a party.  Goldstein v.
Lindner, 254 Wis.2d 673, 681-82, 648 N.W.2d 892, 896 (Ct. App.
2002).  Thus, even if Carl had continued to accept Jensen's

---

[14] Jensen argues that the June 27, 2002 letter from David
(Jensen Exhibit 10) constitutes an admission by David that Carl
had renewed the Lease.  The wording of the letter, particularly
when coupled with the delivery of the June 26 letter from Klein
and the then polite but very strained relationship between David
and Jensen, is most accurately construed as a statement from
David that what was "dead" was the Lease, not any subsequent
(non-existent) agreement.

Page 20 of  74

performance as a way of confirming the continuing validity or vitality of the Lease (although that is not what the Court is saying), that behavior would not revive Jensen's right to operate. Once the lease terminated, the possibility of reverter became possessory and Jensen was left with no interest in the land. He and Carl would have had to have entered into a new lease.

As of March 1 and forward, Jensen remained on the site in a very precarious and frustrating situation. He had used up most of his money and all of his time on the first Lease period, and all he had to show for it was a little bit of production and major defaults on the Lease and the note. He clearly had not complied with the requirements to extend the Lease for another year, and so was vulnerable to Carl telling him to leave.

What Jensen had going for him was that Carl had no one else to replace Jensen. If Carl ordered Jensen off the property, there would be no one looking for gold. This was at a time when, according to Hal, Carl was accumulating $26,000 in credit card debt to keep the companies going. It is true that Jensen would still be liable for the note payment, and his production and his equipment would be available for liquidation. But Carl would reasonably be wondering whether Jensen could or would pay the note. There was very little production, and Carl must have concluded that much of the equipment that Jensen owned was

Case 04-15468-s11   Doc 303   Filed 10/13/06   Entered 10/13/06 14:43:48 Page 21 of 74

virtually worthless.  So any real hope of a substantial income from the property after all the years and after all the previous failed attempts would have depended on Jensen finding and extracting significant quantities of gold.  Jensen would not be able to do that if he were not on the property.

Jensen's unstated argument is that there were only two options available to Carl: either declare the Lease terminated and order Jensen off the property, which Carl did not do, or renew the Lease by not declaring it terminated and not ordering Jensen off the property.  (Not that the latter is possible; see Greer v. Salmon above.)  In fact, a third alternative was available, which was that Carl was deciding what to do and in the meantime was not electing either alternative.  In other words, the parties' relationship was in a sort of suspended animation.  The Court finds that is what was happening; namely, that as of March 1, 2002, Jensen was staying on the property essentially as Carl's "guest".  Carl was permitting him to stay temporarily, without a formal renewal of the Lease and of course without payment of the $50,000, while he tried to decide what to do and while both of them hoped that significant production of gold would begin in the meantime.[15]

_____

[15] This analysis is consistent with Keller's testimony about Carl's continuing solicitude for Jensen and his operation, including in 2002.

After a mineral lease expires, the lessee is in the position of one holding over after executing a deed. Natural Gas Pipeline Company of America v. Pool, 124 S.W.3d 188, 194 (Texas 2003). The lessee no longer has any interest in the real estate or the minerals. See Jupiter Oil Co., 819 S.W.2d at 468 (A mineral lease is a fee simple determinable; upon termination of the lease the mineral estate automatically reverts to the grantors.)

As a holdover tenant after the expiration of a mineral lease, the general rule is that the landlord has the option to treat a tenant wrongfully holding over as a trespasser who may be ejected, or to accept the holding over and treat him as a tenant. Bryan v. Big Two Mile Gas Co., 213 W.Va. 110, 119, 577 S.E.2d 258, 267 (2001). The decision is the landlord's only; the holdover tenant has no election to treat himself as a tenant. Id. See also Moon v. Marker, 26 Cal.App.2d 33, 36-37, 78 P.2d 460, 462 (1938)(The conditions precedent of the mineral lease must be satisfied to extend the lease and if not satisfied the lessee has no claim to any right of possession and becomes a mere tenant at sufferance.)

Therefore, it was Debtors' election on how to treat Jensen after the lease expired. Jensen had no option but to accept the treatment elected by the Debtors.

Jensen had no reasonable expectation that he could stay for any longer than Carl was willing to let him stay (and certainly

not until March 1, 2003 without Carl's approval), and Carl had no reason to believe that Jensen would consider he had a right to stay on the property longer than Carl was willing to let him. Jensen knew this. And consequently he had no reasonable expectation of being allowed to continue to operate for any given period of time. It is true that after March 1, 2002, Jensen moved a safe and other equipment onto the site.[16] In so doing he clearly was relying on the fact that Carl had not ordered him off the property at the time. But since he had started to accumulate a small collection of gold, it would have made sense in any event to have acquired a safe. And as long as Carl was not ordering him off the property, Jensen could reasonably hope to hit "pay dirt" and thereby persuade Carl to extend or renew the Lease.

---

[16] Jensen also asserts that he committed to a major equipment lease on or after March 1, 2002 in reasonable reliance on an extension of the Lease. However, the alleged evidence of Carl's agreement to an extension, the accounting (Jensen Exhibit 13), was not "executed" until March 27, or later. And although the first page of the Citicapital purchase agreement (the exhibit does not contain the last three pages) appears to require Jensen to begin making payments on March 1, 2002, the stipulated judgment with Citicapital recites in paragraph 3 that the agreement was executed November 17, 2001. Jensen Exhibit 17 ¶ 3. It may be that the reason the payment date was changed to March 1, 2002 was because that was the date the equipment was actually being delivered to the site or purchased by Jensen. And that would make the documentation consistent with Jensen's testimony. (The assignment of the master lease with First Capital is dated July 26, 2001 and the Niebaum equipment purchase is dated April 10, 2001, Exhibits 2 and 7 respectively, so the equipment covered by those leases was presumably already on site by March 1, 2002.)

But none of these actions were taken in reasonable reliance on the right to continue operating for another year.

Jensen's behavior during the spring, summer and fall of 2002 support this conclusion. The Court finds that at the conclusion of the dramatic showdown at the site on July 14, Jensen and Keller quickly and quietly left, and would not have done that had Jensen believed that he had the right to continue operating. And the Court also finds that Jensen otherwise would not have waited until late 2002 or early 2003, when he was sued by the equipment lessors, to make demand on or sue the Lessors and David over his right to operate.

Finally, Jensen could not reasonably have relied on Carl's words or actions to believe that the Lease was still operative. Jensen was an experienced miner; he knew he had not performed under the Lease, and he knew that what it took to renew the Lease had not been done. He undoubtedly knew that when Carl was ready to renew the Lease, Carl would have a document drawn up saying that.[17] No reasonable person in these circumstances would have

---

[17] The June 27, 2002 letter from David to Jensen, Exhibit 10, does not establish that the Lease had been renewed. To begin with, by itself the letter can naturally be read to refer to the termination of the Lease rather than any new arrangement. And it follows by one day, or is at least dated one day after, Klein's letter, dated June 26, 2002, which confirmed or announced the termination of the Lease, making the more natural reading of the June 27 letter to be referring to the termination addressed in the June 26 letter. The Klein letter was authorized by either Carl or David. It would have made no sense for either Carl or
(continued...)

concluded that the Lease had been renewed for another year.[18]
That Jensen paid $19,000 on the $25,000 note obligation on March
27 and April 4, 2002, does not change this result. Jensen was
liable on the $25,000 note regardless of the status of the Lease;
he had already received the consideration for the note when he
was allowed to mine the property for a year.

There is evidence that suggests Carl waived certain other
fairly significant requirements. Paragraph I of the Lease is
reasonably clear that, once the sand, gravel and rock were
"removed, or sold" (emphasis added), the 10% royalty payment
became due. The same applies (albeit not unambiguously so) for
the 12% royalty on gold "resulting from the milling process and
any operations conducted by Lessee on the leased lands and
interests,..." The gold royalty provision is apparently
overridden by the Lease Addendum's provisions for inspecting and
dividing the gold. Jensen did not pay any of the additional

---

[17](...continued)
David to have sent that June 26 letter (Jensen Exhibit 9) if
either of them felt that Carl had entered into a new deal or a
renewal of the Lease. This interpretation is also consistent
with the letters from David to Jensen dated July 7 and July 16
respectively (Lessors Exhibits B and C). And throughout David's
testimony it was evident that he was eager to expel Jensen, so it
is unlikely he would be willing to acknowledge in writing that
any new deal was in place to allow Jensen to stay.

[18] As Debtors point out, given the relationship between
Keller and Jensen, it is telling that Keller did not testify that
at any point Jensen told him the Lease had been renewed. On the
contrary, Keller's testimony was that he and Jensen were
uncertain what would happen were Carl to die.

Page 26 of  74

royalties due upon the sale of sand or gravel.  Nor did he pay
any royalties on the gold that was produced or divide it up with
Carl.  The conduct of the parties suggests strongly that Carl
also waived these requirements, at least until there was a larger
amount of either money or product deal with.  Concerning the
gold, Keller testified that Jensen offered twice to split the
gold with Carl but Carl specifically declined.

A good part of the "evidence" of the waiver of the
obligation to divide the gold each month is that there is no
evidence any such division took place.  Although Carl was on the
site many times and very interested in what progress was being
made, there was no testimony of even a single dividing session
taking place.  Jensen testified that he offered in April 2002 to
split with Carl the gold then available, but Carl declined the
offer.  This all suggests that Carl was waiting for larger
amounts of gold to be produced by Jensen before starting the
division process.[19]

This conclusion also addresses in part David's preposterous
claim that Jensen produced hundreds of thousands of dollars worth
of gold.  Such an action on Jensen's part would be so self-

_____

[19] It is also possible that Carl was concerned that
accepting payments or gold would prejudice Lessors' right to tell
Jensen to leave the site.  In part because the Court is not
convinced that Carl directed the issuance of the Klein letter
(Jensen exhibit 9), there is insufficient evidence of this
motivation.

defeating that it challenges the credibility of the allegation. It is completely at odds with the efforts to sell trifling amounts of gold at the Miner's Days festival and at the Silver City rock shop. And Carl, who kept himself informed about the status of production, surely would have claimed a share of so much gold if it were available. There would be records of that, and there are none.

Carl appears to have waived at least the timing of the performance of some of the other Lease requirements. He accepted late payment of the electricity bills. Jensen never came close to processing 30,000 yards of material, but Carl apparently never informed Jensen that Jensen's failure to process 30,000 tons of material by March 1, 2002 meant the Lease would not be renewed.

Jensen never submitted the production reports required by the lease. Paragraph I of the Lease required Jensen to "report production monthly in forms as Lessors may request." However, no evidence was presented by either side that Lessors had submitted any forms for Jensen to use. It appears either that Carl required no production reports or, more likely, Carl received oral production reports and kept himself otherwise informed about what production was occurring. The Lessors belated demand to Jensen to produce such reports in June or July 2002 came too late; Carl had already waived that requirement at least up through mid-June 2002.

Paragraph F of the Lease called for Lessee to restore the original topography "as mining proceeds".  Given that previous operators had already been on the site and how little mining Jensen actually did, it is not clear how material a breach of the Lease this might constitute.  In any event, even assuming that the quoted phrase required Jensen to engage in restoration while he was operating, it seems this requirement was the last thing on anyone's mind, including Carl's.  The June 26, 2002 letter from Klein makes no mention of it.

In summary, while it is apparent that the Lessors, through Carl, waived performance of a number of the requirements imposed on Jensen by the Lease and the Lease Addendum, certain critical obligations were not waived.  The requirement for renewing the Lease by paying the $50,000 advance royalty for 2002-03 was not waived and Jensen did not perform.[20]  Lessors, either through Carl's (or for that matter, David's) words or actions or through any other action, did not agree to be bound to an extension of the Lease.  The fact that Jensen was continuing to remain on the site did not by itself have the effect of renewing the Lease.  Bryan v. Big Two Mile Gas Co., supra.  The Lease terminated on March 1, 2002.

---

[20] Jensen Exhibit 13 and Carl's actions make clear that Carl waived the January 15 notice requirement.

Case 04-15468-s11    Doc 303    Filed 10/13/06    Entered 10/13/06 14:43:48 Page 29 of 74

The conclusion that the Lease was terminated leads to a number of other conclusions concerning the causes of action asserted by Jensen. There can be no claim of breach of contract except those provisions of the Lease which deal with the consequences of Lessee's breach. (These are discussed below.) Thus the bedrock claim that Jensen had the right to continue to operate for another year after February 28, 2002 is simply not sustainable.

There can be no claim of conversion concerning the right to operate on the site, because Jensen was properly excluded from the site. As explained above, there was a period after February 28, 2002 when Jensen could have been excluded but was not, and both Carl and Jensen knew it. The fact that Jensen was not excluded from the property when he could have been did not reinstate Jensen's right to be on the property and thereby provide him with a cause of action for conversion.

Nevertheless, Carl did allow Jensen to remain on the site and operate for a period of time. And this provided Jensen with certain rights that he would not have had if he been expelled from the site on March 1 and thereby continued on as a trespasser.

Remedies and damages

As described above, Jensen remained on the property with Carl's permission. He continued to produce sand, gravel and

Case 04-15468-s11    Doc 303    Filed 10/13/06    Entered 10/13/06 14:43:48 Page 30 of 74

gold, which production is most logically and reasonably treated according to the terms of the Lease that deal with production. And that is how the persons all seemed to conduct themselves. Jensen's statement that Lessors could keep his production to pay his debts implicitly asserts that the productions was Jensen's. The testimony by David and Hal that Jensen said that, without a qualifying statement on their part that the production did not belong to Jensen, confirms their understanding that the production was Jensen's. And in any event, it would have been unfair of Carl to allow Jensen to continue to operate and produce under the reasonable belief that Carl was allowing the status quo to continue until he told Jensen otherwise. Jensen does have a legitimate claim for promissory estoppel[21], but only in this sense, and not for the broader claim that the Lease had been renewed and Jensen was entitled to stay for another full year. It simply would not have been reasonable for Jensen to rely on

---

[21]     [T]he essential elements of promissory
         estoppel are: (1) An actual promise must have
         been made which in fact induced the
         promisee's action or forbearance; (2) The
         promisee's reliance on the promise must have
         been reasonable; (3) The promisee's action or
         forbearance must have amounted to a
         substantial change in position; (4) The
         promisee's action or forbearance must have
         been actually foreseen or reasonably
         foreseeable to the promisor when making the
         promise; and (5) enforcement of the promise
         is required to prevent injustice.
Strata Production Co. v. Mercury Exploration Co., 121 N.M. 622,
628, 916 P.2d 822, 828 (1996).

Carl's actions to believe the lease had been extended for another year.

Jensen's alleged waiver

Lessors argue that Jensen abandoned his property which constituted collateral for his Lease defaults, including waiving his rights to a commercially reasonable disposition of that collateral. The Court finds that Jensen did not waive his rights.

Part of the Lessors' argument is based on the testimony of David and Hal Dotson that Jensen, on July 14 in the trailer, told David and Hal to take what he had to pay his debts. Jensen denied making any such statement (and by this time on July 14, Keller was outside the trailer and thus beyond hearing distance).

It is conceivable that Jensen made such a statement, especially if he thought that he owed the rest of the note plus $50,000 for 2002-03. Much of the mining equipment was worthless, as demonstrated by the months of ultimately futile effort to get it all working efficiently and Keller's testimony that they would have been better off just junking the equipment and starting again with other equipment.[22] He may not have thought the sand

_____

[22] Renee Gurule, the heavy equipment rental coordinator for Wagner Equipment Company, testified that she provided to Jensen the 2002 rate sheet admitted as Jensen exhibit 11. However, she also testified that she never saw Jensen's equipment and so could not say what condition it was in. Her testimony was entirely credible but completely lacking in probative value.

and gravel would be nearly enough to pay the $50,000, especially after the argument with David about how much sand and gravel was actually stockpiled and taking into consideration how much of a fight he would have with David about it. This might also explain why Jensen did not immediately demand a commercial disposition of the product. This interpretation of the evidence would be consistent with the other actions of Jensen, Keller and Carl, which strongly suggest that none of them thought the operation produced much significant value, at least in the way of gold. All this would provide the context in which a statement by Jensen, telling David and Hal to keep what he had to pay his debts, made perfect sense.

On the other hand, that statement, if it was made, does not literally say that Lessors may take what Jensen has to pay his debts and not return the rest. The evidence is clear that what Jensen desperately wanted then, as he does now, was the chance to continue to operate at the White Oaks site. It is also clear that what he was hearing that day was what he had been trying to prevent for months: the Lessors, originally in the person of Carl and now in the person of David, telling him that the dream of a golden payday at the White Oaks site was now ended. Whether there was sufficient collateral to leave him something after his debts were paid was not the big issue, or perhaps even an issue at all in Jensen's mind at that time. And therefore the Court

cannot find that in making that statement, Jensen was waiving a commercial disposition of his collateral and a return to him of what was not needed to pay his debts.

Part of Lessors' waiver or ratification argument is also based on Jensen's failure to take any action to assert ownership rights to the collateral until months later. Lessors point to ¶ M that requires Jensen to remove his equipment within sixty days of the termination of the Lease or lose it to Lessors. Lessors claim that Jensen abandoned the equipment by not removing it within the sixty days. The June 26, 2002 Klein letter (Jensen Exhibit 9) states that the sixty days began to run from March 1, 2002. Given that the Lessors had not notified Jensen of the termination of the Lease and of his obligation to leave on March 1, the time could not have begun to run that early. To hold otherwise would ignore Carl's conduct in keeping open the option to re-sign the Lease, and would be quite unfair to Jensen. In addition, David had locked Jensen out of the site starting no later than about June 26, 2002, and Jensen had no way to get his property. Given David's assertion that Jensen owed $161,000, Jensen had no expectation that he would be able to recover any of his equipment. This would have seemed particularly obvious as David moved some of Jensen's equipment onto the site and then used it all to continue operations. Finally, as is apparent, in

Page 34 of 74

June and July 2002 Jensen had few resources to initiate legal action to recover his property.

The Court also finds that Jensen did not unreasonably delay in asserting his rights to the collateral, including to the leased equipment. Jensen was expelled from the site in the middle of July. If David and Hal are correct in what Jensen said (i.e., take what I have to pay what I owe), that statement, coupled with Jensen's statements to Keller and his actions in quickly leaving the site, suggest the behavior of a person hit hard emotionally with the realization that his mining operation was over. That emotional impact could result in the need for a period of time to recover and consider options. It appears that Citicapital's replevin action against Jensen was filed within a few months. Jensen Exhibit 17 (No. D-0117-CV-200202462). And it was in that action that Jensen filed his third party action against Lessors and David.[23] And he had already seen counsel (William Arland) before he was sued.[24] Whatever Jensen's state of mind was, his delay in taking action to protect his interests was not unduly long under the circumstances.

---

[23] The second action appears to have been filed in early 2003. Exhibit 18 (No. CV-2003-02267). Plaintiff First Bank sued Lincoln and David; Jensen filed a third party action against Old Abe.

[24] Under cross examination, Jensen testified that he went to see Mr. Arland after receiving the letter from Klein, and that he left in Mr. Arland's hands the question of what to do.

Page 35 of 74

> Generally, New Mexico cases have defined waiver as the intentional relinquishment of abandonment of a known right.... [T]he intent to waive contractual obligations or conditions may be implied from a party's representations that fall short of an express declaration of waiver, or from his conduct.

J.R. Hale Contracting Co., Inc. v. United New Mexico Bank, 110 N.M. 712, 716, 799 P.2d 581, 586 (1990). (Citations omitted.) Jensen's circumstances and the action that he subsequently took, were such that he cannot be said to have intelligently and knowingly waived his rights. Nor by his earlier inaction did Jensen ratify the Lessors' treatment of the collateral. See McDonald v. Burke, 288 S.W.2d 363, 367-68 (Ky. 1956):

> The doctrine of equitable estoppel is frequently applied to transactions in which it would be unconscionable to permit a person to maintain a position inconsistent with one in which he, or those by whose acts he is bound, has acquiesced. Declarations or conduct which might not of themselves amount to an estoppel may become such by acquiescence. Estoppel by acquiescence is, obviously, closely related on the one hand to estoppel by consent, and, on the other hand, to estoppel by silence or inaction, or by delay. In fact it is often impossible to distinguish clearly between such estoppels, and the courts in many instances use the term 'acquiescence' as covering or including all the others. 'Acquiescence,' as the term is here used, however, refers to an implied consent and need not involve anything in the nature of a positive affirmation; and while, as has already been pointed out, silence or inaction may, under some circumstances, amount to acquiescence, it does so only where the circumstances are such as to afford some ground for believing that acquiescence was intended. The rule is well recognized that where a party with full knowledge, or with sufficient notice or means of knowledge, of his rights and of all the material facts remains inactive for a considerable time or abstains from impeaching a contract or transaction, or freely does what amounts to a recognition thereof as existing, or acts in a manner

inconsistent with its repudiation and so as to affect
or interfere with the relation and situation of the
parties, so that the other party is induced to suppose
that it is recognized, this amounts to acquiescence and
the transaction, although originally impeachable,
becomes unimpeachable.'

<u>Cf.</u> Restatement (Second) of Contracts § 69 cmt. a (1981)
(Acceptance of an offer by silence is exceptional.)  Jensen acted
quickly enough to communicate his non-acquiesence in the
treatment of the collateral.

<u>Jensen's collateral rights</u>

One consequence of the holding that what Jensen had produced
was his is that he owed royalties on that production at the rates
provided for in the Lease, even though he had not paid the
$50,000 advance royalty.  As odd as it may seem that Jensen
should not have to pay the $50,000 advance royalty, that result
follows from Carl's allowing Jensen to continue to operate
without having paid the $50,000.  Payment of the $50,000, or the
imposition by the Court of the obligation to pay it, would have
the effect of the parties entering into a lease for another year,
and would be contrary to the promissory estoppel that the
Lessors, through Carl, brought about.  By not paying the $50,000
advance royalty, Jensen gave up the right to stay on site and
operate for another full year.  And in doing so, he risked having
the Lessors expel him from the property at any time (which they
eventually did) even if he were to have suddenly discovered an
enormously valuable deposit of gold.

On the other hand, not paying the $50,000 advance royalty did not mean that he did not have to pay royalties on what he processed; that obligation remained. Jensen was never entitled to mine the site free of charge, so it makes sense Jensen would still owe royalties on what he produced. Carl's conduct, whether characterized as acquiescence or promissory estoppel or other similar theory, was such that the rights and remedies of the parties "continue[d] to be governed by lease-type rights and responsibilities – _i.e._, a 'holdover tenancy'". <u>Bryan v. Big Two Mile Gas Co.</u>, 213 W.Va. at 120, 577 S.E.2d at 268. Jensen's loss of the right to continue on the site does not mean, in these circumstances where Carl allowed him to stay, that everything he produced belonged to the Lessors, which would be the case if Jensen were a trespasser.[25]

Another consequence of the holding is that the royalty payments need to be allocated for the production ending on February 28, 2002 and that which began on March 1, 2002. As is detailed below, the production through February 28, 2002 was

---

[25] The measure of damages for a trespass committed under an honest belief by the trespasser that it was acting within its legal rights is the value of the product less the cost of production, <u>Bryan v. Big Two Mile Gas Co.</u>, 213 W. Va. at 120, 577 S.E.2d at 268, which cost must be reasonable. <u>Id.</u> at 121, 577 S.E.2d at 270. A wilful or bad trespasser loses the right to deduct the cost of production. <u>Id.</u> at 120, 577 S.E.2d at 268. <u>Accord</u>, <u>Alvarado Mining & Milling Co. v. Warnock</u>, 25 N.M. 694, 187 P. 542 (1919); <u>Deltic Timber Corp. v. Great Lakes Chemical Corp.</u> 2 F.Supp.2d 1192, 1200 (W.D. Ark. 1998).

Case 04-15468-s11   Doc 303   Filed 10/13/06   Entered 10/13/06 14:43:48 Page 38 of 74

small enough that the advance royalty covered the royalty payments in full.

The Lease has specific language about how the production and the equipment are to be treated as collateral to ensure compliance by Jensen with his Lease obligations. ¶ M. From the commencement of the Lease, the equipment on the site (and the production) constitute collateral. On termination of the Lease, if Jensen were to be current on his Lease obligations, he has sixty days to remove the equipment from the site. If he is not current on termination of the Lease, then all Jensen's equipment, whether on site or not, becomes collateral to secure payment of "any sums unpaid" under the Lease. The Lease terminated on March 1, 2002. As of that date, unpaid sums included the promissory note and the electricity bills. Thus, "all production stockpiled on site and all equipment [became] security for any sums unpaid under the lease...."

"Equipment" is not a defined term in the Lease. Paragraph N of the Lease, titled "Equipment and Commencement of Operations", refers to "equipment on site for conduct of operations" and requires that Jensen purchase that equipment from Niebaum. The language suggests that by "equipment" the parties meant items like conveyor belts, crushers, screens, etc., and in fact this is what Jensen purchased from Niebaum. However, the term "all equipment" in ¶ M suggests a broader scope for that term when the

Lease has been terminated and the lessee owes money to the Lessors. Paragraphs M and N address quite different purposes of the Lease and relationships between the parties, and those differences are reflected in the language of the two paragraphs of the Lease. Thus the phrase "all equipment" is reasonably read to include everything Jensen had assembled for the operation that could reasonably be characterized as "equipment".[26] The parties have treated the term this way; <u>e.g.</u>, Jensen Exhibit 8, which includes the pickup truck, the dump truck and the grader in the list of "White Oaks Gold Mine Equipment".

The equipment and the product were to be treated as collateral, not deemed abandoned or forfeited outright as would be the case for equipment left on the site sixty days after termination of the Lease with Jensen being current. Lease, ¶ M. Jensen was entitled to a commercially reasonable disposition of the collateral and the return to him of excess proceeds.

Analogizing the Lease to a non-mineral lease, to allow the lessor to dispose of the collateral in a non-commercially reasonable manner and to keep any amount greater than the total amount of past or future rent owed by lessee would run counter to New Mexico's landlord's lien statute and the underlying principles of American contract law. N.M. Stat. § 48-3-5 (1997);

---

[26] One definition of "equipment" is "all the fixed assets other than land and buildings of a business enterprise". Webster's Ninth New Collegiate Dictionary 421 (1993).

<u>Nearburg v. Yates Petroleum Corp</u>. 123 N.M. 526, 943 P.2d 560 (Ct. App.), <u>cert. denied</u>, 123 N.M. 446, 942 P.2d 189 (1997).

The relevant section of Paragraph M of the lease agreement essentially creates a landlord's lien on the mining equipment and any minerals present on the leased site. In fact, if Paragraph M did not include the section regarding the lien, New Mexico law would automatically have created a landlord's lien on property of the lessee's that "remains in or about the premises rented." N.M.S.A. § 48-3-5. This would include the mining equipment and all minerals present on the site as of the beginning of the tenancy or after property came onto the premises. <u>Id.</u>; <u>Nat'l Inv. Trust v. First Nat'l Bank</u>, 88 N.M. 514, 543 P.2d 482 (N.M. 1975); <u>Kuemmerle v. United N.M. Bank</u>, 113 N.M. 677, 831 P.2d 976 (N.M. 1992). According to the statute, the lien will secure only the rent due and the rent to become due. § 48-3-5; <u>Chessport Millworks, Inc. v. Solie</u>, 86 N.M. 265, 522 P.2d 812 (Ct. App. 1974). This interpretation dovetails with the wording "in satisfaction of any sums due [Lessors]" in ¶ M of the Lease.

Limiting the reach of the lien in this case also complies with the Restatement (Second) of Contracts, and avoids the problem of making Lease ¶ M into an invalid liquidated damages clause. <u>See</u> Restatement (Second) of Contracts § 356 (1981); <u>Nearburg</u>, 123 N.M. at 532, 943 P.2d at 566 ("A penalty is a term fixing unreasonably large liquidated damages and is ordinarily

Case 04-15468-s11    Doc 303    Filed 10/13/06    Entered 10/13/06 14:43:48 Page 41 of 74

unenforceable on grounds of public policy because it goes beyond compensation into punishment.").

Hal Dotson conceded that Lessors sent no notice to Jensen concerning the sale of any of the collateral. The sale of collateral needed to comply with the "commercially reasonable" standard set by N.M. Stat. § 55-9-504 which follows U.C.C. § 9-504. While the underlying contract is a lease agreement, not normally subject to the U.C.C., courts throughout the country have applied their identical state enactments of § 9-504 to apply to the sale of collateral obtained through a lien on property other than goods. Akins v. Santa Clara Land Co., Ltd., 34 S.W.3d 334 (Tex. App. 2000) (applying requirement to collateral seized through landlord's lien); River Valley State Bank v. Peterson, 154 Wis.2d 442, 453 N.W.2d 193 (Ct. App. 1990) (same); Cantrade Private Bank Lausanne Ltd. V. Torrsey, 876 F.Supp. 564 (S.D.N.Y. 1995) (mortgage lien); Iama Corp. v. Wham, 99 Nev. 730, 669 P.2d 1076 (Nev. 1983) (same).

Jensen's debt

As of March 1, 2002, the date on which the Lease was terminated, Jensen owed $662.32 for unpaid electricity bills and approximately $27,500 on the promissory note.[27] Jensen Exhibit

_____

[27] The Court has already noted that by accepting the promissory note in addition to the $25,000 cash, Lessors had received the full $50,000 advance royalty required by the Lease. See also ¶ I (Lessors' acknowledgment of receipt of nonrefundable

(continued...)

13. However, by the time that the collateral was applied to the debt, the electricity bill had been paid, including the March 2002 bill for $117.04[28] (Jensen Exhibits 13 and 27), and the promissory note obligation had been reduced by $19,000 (Jensen Exhibits 13, 27 and 28) to approximately $8,500, comprised of $6,000 remaining principle plus 10% interest on $25,000 for about one year.

The royalties on the small amount of sand, rock gravel and gold produced before March 1, are a fraction of the $50,000 advance royalty already paid. In consequence, no further royalty payments were due for the first (and only) year of the Lease, either on March 1, 2002, or in July 2002 when Jensen was expelled from the site. Jensen did owe Lessors royalties from the production from March 1 onward. Because the Court rules (below) that the amount of these royalties should be netted out against the value of the production, the royalties owed for March 1 and afterward are not included in this calculation of what debt Jensen owed to Lessors. So, the "unpaid sums" that Jensen was

---

[27](...continued)
deposition [sic] on first year annual advance royalty). But the satisfaction of the requirements of ¶ I does not mean that the unpaid portion of the promissory note did not constitute a part of "any sums due" as addressed by a different paragraph of the Lease. ¶ M.

[28] There was no evidence of any additional electricity bills for April through June or July 2002 that were incurred and not paid. But those bills, and the March bill, for that matter, would not come under the first year bills that needed to be paid.

obligated to pay from the year the Lease was in effect was about
$8,500.

Value of Collateral

Jensen's property that constituted the collateral taken by
Lessors was comprised of the following: (a) the equipment Jensen
was purchasing from Niebaum (Jensen Exhibit 7); (b) the equipment
he was purchasing, in the form of a lease[29], from First Banks by
virtue of an assignment of Niebaum's lease from First Capital
Group: the master lease (Jensen Exhibit 3) incorporating the
lease schedule for the 1994 Case Loader Model 821B (Jensen
Exhibit 4) and the lease schedule for the Cardinal scale
(included in which are the concrete deck and load cells)[30] and
the Caterpillar generator (Jensen Exhibit 5); (c) the equipment
he was purchasing from Citicapital pursuant to a purchase money
security agreement, comprised of a Deere excavator, three Goodman
radial stackers, and a Goodman conveyor (Jensen Exhibit 6); (d)
assorted items of equipment including the Ford 350 pickup truck,
the dump truck, the grader, two underground loaders, the gold
wheel, water pumps, supplies of oil, etc. but excluding the sand,

---

[29] Terms of the lease schedules, including a "purchase
price" and a fixed price obligation on lease termination of
$1.00, make it clear that the lease was really a purchase
agreement.

[30] Jensen testified that the Cardinal digital indicator and
the Okidata ticket printer were never delivered, although these
two items are listed on Jensen Exhibit 5.

gravel and rock as detailed in the "upper list" of equipment in
Jensen Exhibit 8; (e) the sand, gravel and rock that had been
stockpiled; and (f) the gold that had been produced.

Jensen attempted to establish the value of the property
through, inter alia, Jensen Exhibits 8 and 19. He partially
succeeded, as follows:

(a) The evidence was clear that the screen plant and conveyors he
bought from Niebaum (Jensen Exhibits 7 and 8[31]) were in bad shape
when he took them over and that they never functioned adequately.
And Keller's testimony that the equipment as a whole did not
function and should have been replaced, suggests that perhaps the
sand screw, the magnetic drum, and the sluice box did not
perform. Thus, although the purchase price of $44,000 (Jensen
Exhibit 7) was the result of arm's length negotiations, the
equipment overall simply was not worth that. The mobile home
office and furnishings obviously performed their function, and
there was no evidence that the portable welder did not function.
Therefore the Court assigns a value to the Niebaum equipment of
$5,000.

---

[31] Exhibits 7 and 8 are somewhat contradictory; for example,
the total purchase price of the equipment was $44,000 according
to Exhibit 7, whereas the Niebaum list on Exhibit 8 values the
screen plant all by itself at $45,000. The Court finds that the
lower values it has selected effectively resolve the
discrepancies.

(b) The First Bank equipment purchase was presumably negotiated at arm's length between Niebaum and First Capital.[32]  The first lease schedule sets a purchase price of $71,237.50 for the Case loader, and the second lease schedule sets a price of $35,000 for the equipment, for a total of $106,237.50.  The judgment obtained by First Bank (Jensen Exhibit 18) was for $96,809.42, exclusive of attorneys fees.  The list attached to the judgment includes the digital indicator and the Okidata ticket printer, which were not supplied.  Assigning a value of $10,000 to those two items together (a figure which may well overstate their value), the Court assigns a value to the First Bank equipment of $86,809.42.[33]

(c) The Citicapital agreement values the equipment at $25,726.58. Jensen Exhibit 6; Jensen Exhibit 17 ¶ 3.  There was no direct testimony that this equipment did not function as it was supposed to.

(d) The assorted equipment contained in the "upper list" on Jensen Exhibit 8 is valued at $262,987.  Jensen testified that a six-inch water pump that he purchased did not work, and so he

---

[32] The master lease was assigned to Jensen.  Jensen Exhibit 2.

[33] That Jensen had paid nothing on this lease/purchase agreement or on the Citicapital agreement is irrelevant; the equipment had been delivered to him and Jensen had obligated himself to pay for it, and in fact now has a judgment against him for its price.

replaced it. Two water pumps are listed in Jensen Exhibit 8; one for $20,000 and one for $2,000. Given Jensen's financial circumstances, it is most likely that the replacement pump was purchased for $2,000. Thus the Court will reduce the overall value by $20,000. In addition, given what has already been said about the state of Jensen's equipment as a whole, the Court will also reduce the value of the "upper list" by an additional $60,000, representing the 150 Reed screen, since that would appear to be another critical component of a mining operation of this type.

Jensen valued the pickup at $12,000, but Lessors sold it for $3,000. Hal testified that Carl had incurred $75,000 of personal credit card debt for the companies, and new management (David and Hal) were selling assets, including the pickup, for whatever they could quickly get to pay down that debt. The Court accepts the $12,000 figure for the pickup (Jensen Exhibit 8) rather than what was probably a fire-sale price of $3,000 that the Lessors sold it for.

Jensen also valued the two underground loaders at $25,000 each, for a total of $50,000. David testified that he sold the underground loaders for a gross price of $11,000 for use in Canada, where an apparently more liberal regulatory environment for underground mining made them more useful. He testified that the price was low because of the restrictive environment for

underground mining in the United States.  No one disputed this testimony.  The underground loaders were sold at auction, so the Court has taken the sale values as the best price that could be obtained.  In consequence, the damage figure must be further reduced by $39,000.

Page one of Jensen Exhibit 19 also lists daily rental values for the equipment.  (Page two lists the "ownership" values.) There was no evidence that Jensen could have used any of the functioning ore processing equipment elsewhere.  And although there was evidence that Jensen was engaged in other dirt-moving activities elsewhere, there was insufficient evidence that he could have used the rolling stock at those sites, or leased it to someone else.  When asked, Jensen said that the equipment was not for rent.  In addition, the daily rental value (which, given the status of the equipment overall, is vastly overstated) constitutes consequential damages which the Court cannot award in this case.  See Wall v. Pate, 104 N.M. 1, 2, 715 P.2d 449, 450 (1986):

> The distinction between general and special [i.e., consequential] damages arose in the touchstone case of Hadley v. Baxendale, 9 Exch. 341, 156 Eng.Rep. 145 (1854).  Later cases freely translated the rule of Hadley to mean that special damages may be recovered if the loss was foreseeable by the breaching party at the time of contracting.  D. Dobbs, Remedies, § 12.3 at 804 (1973).  Justice Holmes more critically analyzed the foreseeability of damages rule to include a "tacit agreement" by the defendant to respond in damages for the particular damages understood to be likely in the event of breach.  Globe Refining Co. v. Landa Cotton

Oil Co., 190 U.S. 540, 23 S.Ct. 754, 47 L.Ed. 1171
(1903). ... Stated another way, special provable
damages flow from the disappointment of a special
purpose for the subject matter of the contract or from
unusual circumstances, either or both of which were
known to the parties when they contracted. In such a
case, the amount permitted under the general damage
formula, alone, clearly will be either inadequate or
nonexistent.

The contract documents themselves do not show that rental values

of equipment would be within the contemplation of the contract,

nor did the trial testimony indicate that they were within the

parties' contemplation. Cf. N.M.S.A. § 55-2-715(2)(a) (The

Uniform Commercial Code describes consequential damages as "any

loss resulting from general or particular requirements and needs

of which the seller at the time of contracting had reason to know

and which could not reasonably be prevented by cover or

otherwise.")

Jensen Exhibit 8 values the Kenworth dump truck at $8,000.

Lessors elicited testimony from John Chavez, a self employed

mechanic, that the dump truck was in bad shape. His testimony

was laced with details about the poor condition of the dump

truck, and was credible and consistent with Keller's brief

testimony about the broken leaf spring. However, Lessors offered

no testimony about what the value of the dump truck was in that

condition, and the Court does not have sufficient expertise on

its own to assign a different value. The same applies to Chavez'

and Clark's testimony about the generally bad shape of the other

equipment, and to Holland's testimony about seeing the backhoe with a leaking back end.

Other than the foregoing, there was no testimony that disputed the values shown on the "upper list" on Exhibit 8.[34] Indeed, the evidence strongly suggested that the vehicles, underground loaders, etc. all functioned well enough to be used in the operation by David or sold, and that items such as the storage container, and the safe would have performed as they were supposed to had no one cut the lock, obtained the combination, etc. Therefore the Court has valued this collateral at $143,987.

(e) The parties disputed how much sand, gravel, rock and especially gold had been produced. The Court finds that Jensen's evidence of the production of of sand, rock and gravel was credible albeit flawed.

Jensen Exhibit 12[35] consists of some figures maintained on a pad of paper, which appear to show operations and production for the period January 28 through April 12, 2002. What they appear

---

[34] Jensen Exhibit 15 is a copy of a mechanic's lien for repairs to and storage of the dump truck. Since the Lessors should not have had possession of the dump truck to begin with, given the surfeit of collateral, Lessors are not entitled to an offset for this lien. Given the Court's disposition of the dump truck by awarding its value to Jensen, there is no need to deal further with the lien.

[35] Exhibit 12 was admitted by stipulation at the beginning of the trial. No one testified about it during the trial; however, the evidence suggests that it was compiled by Keller rather than by Earl Clark who was gone by the time the later entries were made.

to show was activities and production over ten weeks that roughly spanned equal periods before and after the termination date of the Lease on March 1. The activities are consistent with Keller's testimony, that he and the others spent much of their time trying to get the equipment running and processing relatively small amounts of ore. Keller and Jensen also testified that they spent all their time in 2001 getting the equipment repaired and running. However, Keller also consistently testified that it was not until the end of February that he returned to the site and major work recommenced. The Court finds that Keller was a credible witness; however, in this instance the Court believes that the written evidence, Jensen Exhibit 12, which appears to be a record contemporaneously compiled, is probably a reasonably good approximation of when the production took place. Assuming that to be the case, it is likely that Jensen produced about half before March 1, 2002, and the other half on March 1, 2002 and afterward. The production on March 1 or afterward was not covered by the $50,000 payment, and so Jensen's claim should be reduced by the amount of the royalties that he owed the Lessors on that production.[36]

---

[36] The royalty owed on this production is so closely related to the production itself that it essentially constitutes a defense to Jensen's claim for payment for the production. This is what is defined as recoupment. "[A] creditor properly invoking the recoupment doctrine can receive preferred treatment even though setoff would not be permitted. A stated

(continued...)

Jensen valued the sand, gravel and rock at $43,250 (Jensen Exhibit 8). Jensen valued the sand at $11.00 per yard. Since there was no other testimony about the value of the sand, the Court accepts that number. There was evidence that Jensen sold some gravel and rock to Harry Lovelace[37] for $7.00 per yard, but the Court accepts Jensen's lower value of $4.50 per yard for the gravel and rock (Jensen Exhibit 8). Based on the finding that half the sand and gravel was likely produced before March 1 and half on or after that date, the Court finds that $21,625 of the sand, gravel and rock constituted Jensen's "pre-March 1" collateral and $21,625 constituted Jensen's "March 1 or after"

---

[36](...continued)
justification for this is that when the creditor's claim arises from the same transaction as the debtor's claim, it is essentially a defense to the debtor's claim against the creditor rather than a mutual obligation, and application of the limitations on setoff in bankruptcy would be inequitable." Ashland Petroleum Company v. Appel (In re B & L Oil Company), 782 F.2d 155, 157 (10th Cir. 1986) (addressing recoupment in a bankruptcy context) (Citations and internal quotation marks omitted.); see also Davidovich v. Welton (In re Davidovich), 901 F.2d 1533 (10th Cir.1990); Conoco, Inc. v. Styler (In re Peterson Distributing, Inc.), 82 F.3d 956 (10th Cir.1996). Thus it is appropriate to net out the royalty payment owed to Lessors despite the fact that, as Jensen notes, no counterclaim was asserted in the claim objections.

[37] Lovelace was unclear about whether he ever purchased gravel or rock from Jensen; it appears that he or his son probably did. In any event, it seems clear that Jensen and occasionally David were selling rock and gravel to someone.

collateral.  From this latter figure needs to be subtracted the 10% royalty, or $2,162.50.[38]

Exhibit 12 also shows sales of 96 yards.  This presumably was gravel and rock, given that most of the entries talk about sizes of product ranging from 3/8" to 4".  Jensen Exhibit 8 values the gravel at $4.50/yd.  That would result in a royalty of $43.20 ($4.50/yd. x 96 = $432 x .10 = $43.20) for gravel and rock that was not in the stockpile on July 14.  That figure should probably be offset by half the amount of gravel taken by David for sale to Lovelace[39], but there was no evidence of how much David took, so no offset will be allowed.  In addition, Jensen agreed that he sold about 300 yards at $7 per yard to Lovelace. That would result in an additional royalty owed of $210.  None of the figures in Jensen Exhibit 12 identify the buyer or specify the price, so one cannot tell whether the Lovelace sales are in that exhibit.  The Court has therefore concluded that royalties for gravel and rock sold by Jensen totaled $253.20 ($43.20 + $210.00).  Taken together with the royalties owed by Jensen for

---

[38] There was no evidence that any of the sand and gravel came from the mine dumps, so the 15% royalty rate would not be applicable.

[39] Jensen stated that during the July 14 meeting, Lovelace showed up to purchase some gravel and David operated the front end loader to provide it to him.  Clark also testified that several times David used the front end loader and the dump truck to deliver gravel to his (David's) friends.  The Court has no reason to disbelieve Clark, but also has no way to estimate the amount of Jensen's gravel that David took.

Case 04-15468-s11    Doc 303    Filed 10/13/06    Entered 10/13/06 14:43:48 Page 53 of 74

the gravel he sold, the royalties owed to Lessors for sand, gravel and rock total $2,415.70. Subtracting this figure from the total value of the sand, gravel and rock ($43,250) results in a value of Jensen's sand, gravel and rock collateral, adjusted for royalties owed, of $40,834.30.

(f) There was little specific testimony about when the gold was produced. Jensen testified that they began producing specimen gold in late March. It also appears that the gold was being produced at the same time as the sand and gravel; at least there was no testimony of substantial production of gold separate from any of the other operations at the site. The Court has therefore assumed that the gold was produced in the same time frame, and accordingly finds that half the gold was produced before March 1 and half on and after March 1.

How much gold was left on site, other than what was taken from the safe (addressed below), was left somewhat unclear from the evidence.[40] As elaborated below, David's statements about how much gold had been produced were not credible. For purposes of this section, the Court finds that the amount of gold produced was somewhere between 44 and 80 ounces. Because it was Jensen's

_____

[40] The testimony was clear also that some decorative gold had been sold in Silver City and at Miners' Days. See Jensen Exhibit 32 and Lessors Exhibit E. The royalties on the sales of that gold, presumably produced before March 1, 2002, were so small that they were easily covered by the $50,000 advance royalty.

Case 04-15468-s11   Doc 303   Filed 10/13/06   Entered 10/13/06 14:43:48 Page 54 of 74

burden to prove how much gold he produced, the Court will take somewhat more than 44 ounces as the amount produced and still at the site after July 14. At $250 per ounce,[41] that would be a minimum of $11,000. Jensen Exhibit 19 listed the value at $12,500, reflecting Hal's testimony that he sold the totes for $10,000 and one high grade piece for $2,500. For purposes of calculating collateral values, the Court accepts the $12,500 figure for the gold.[42] Assuming that half the gold was produced on or after March 1 and therefore subject to the 12% byproduct royalty not covered by an advance royalty payment, the value would have to be reduced by $750.00 ($12,500 x .5 = $6,250 x .12 = $750), leaving a subtotal of $11,750.

That figure might have been subject to further reduction because of the additional 12% royalties on the sales of gold at the Miners' Days Fair at White Oaks in April 2002. Jensen Exhibit 32 lists the gold sold that weekend totaling $2,175.[43]

---

[41] Jensen testified without opposition that in the spring of 2002 the price of gold ranged from $240 to $260 per ounce. The Court finds that at the relevant times, gold was selling for $250 per ounce. In fact, displayed attractively as part of specimen gold, the metal may have had a greater value than the commodity prices suggest, but the Court does not have sufficient evidence before it to arrive at a different value.

[42] This figure may in fact be less than the fair market value at that time for whatever amount was sold. Because the Court has no other basis to know exactly the amount of the gold, it has adopted the figure of $12,500.

[43] Jensen estimated early in the trial that he and Keller
(continued...)

Case 04-15468-s11   Doc 303   Filed 10/13/06   Entered 10/13/06 14:43:48 Page 55 of 74

In addition, Jensen and Keller consigned $4,605 of gold to the
Royal Scepter in Silver City on June 15, 2002.[44]  Some of it was
sold; the remainder was picked up (along with, presumably, the
cash for the gold that was sold) on July 25, 2002.  Lessors
Exhibit E.  Keller testified that he delivered the gold to Jensen
in Chama.  There was no further testimony that the gold was
returned to or otherwise divided up with Lessors (this was, after
all, after Jensen had been kicked off the site), so Jensen would
have owed the 12% royalty on this gold also, in the amount of
$552.60.  Together the royalties on this gold, which was an
amount separate from the $12,500 described in the preceding
paragraphs, totaled $813.60.[45]  However, Keller's testimony was
clear that Carl told Jensen and Keller that they need not pay
royalties on these sales or share this gold in kind.[46]  This
statement by Carl constituted a waiver by the Lessors, and thus

---

[43](...continued)
had sold about $2,100 worth of gold that weekend.

[44] Jensen mentioned that some gold was placed on consignment
in Ruidoso; however, there was no testimony that any of that was
sold or was retained by Jensen.

[45] Keller also fleetingly testified that some amount of gold
was sold to friends of Carl, but since there was no testimony
about what amount that was, the Court has not taken that into
consideration.

[46] This royalty was a small enough figure that Jensen could
have afforded to pay it.  Similarly, Jensen had the gold with
him, so that he could have shared it in kind.

David had no basis for attempting to collect payment for those sales or for that gold later in the year.

Total Collateral Value

Adding up the total of these collateral values results in a figure of $314,107.30. This is the value of the collateral retained by Lessors to repay a debt of $8,500. Netting out the figures results in a claim by Jensen against the Lessors for $305,607.30.

The Missing Gold and Mining Plan

> Conversion is defined as the unlawful exercise of
> dominion and control over personal property belonging
> to another in exclusion or defiance of the owner's
> rights, or acts constitution an unauthorized and
> injurious use of another's property, or a wrongful
> detention after demand has been made.

Nosker v. Trinity Land Co., 107 N.M. 333, 338, 757 P.2d 803, 808 (Ct. App.), cert. denied, 107 N.M. 267, 755 P.2d 605 (1988). (Citations omitted.) In addition to the Lessors' unreasonable retention of Jensen's collateral, they, through David, also converted other property of Jensen; namely, the gold and other items taken from the safe and the office trailer.[47]

---

[47] In the course of operations, Jensen produced gold in various forms: specimen gold (rock with gold on or in it), gold in vials (nuggets and dust), and concentrate or placer gold (sand containing concentrations of gold). There was also testimony about "decorative" gold, consisting of small items of nugget gold or specimen gold that were sold at the Miners' Days or at the rock shop in Silver City, and about "practice" gold (specimen gold that was to be used to experiment with hydraulic systems to make the gold more accessible).

Case 04-15468-s11   Doc 303   Filed 10/13/06   Entered 10/13/06 14:43:48 Page 57 of 74

There is no question that some gold and the mining plan were taken either from the trailer or from the storage container or the safe.[48]  There is also no question that it is not immediately obvious who took those items.  The suspects include, in no particular order, Keller, Roxanne Dotson and Hal Dotson, the persons alleged to be Church of Scientology members, Jensen and David Dotson.  The Court finds that David Dotson took those items, without of course disclosing that theft to Jensen.

Keller had access to the safe (which means he also had access to the storage container) and the office trailer.  He had long been a colleague of Jensen's, and was certainly invested in making the project work.  He cooperated with Jensen in processing, safeguarding and marketing the gold.  Toward the end of the project he was not getting paid.  And he had been in the mining business for a number of years, which business, because of its nature, presumably breeds in its participants a keen sense of survival.  So he had access and the incentive to have taken some of the gold.  However, those factors would not explain why Keller would have taken the mining plan as well.  The Court also observed the demeanor of Keller and compared his testimony with the testimony of other witnesses and the exhibits.  For example, Keller testified that he kept careful records of all the gold

---

[48] Keller also testified that the production records were missing from the trailer.

that was sold, and Jensen exhibit 32 and Lessors Exhibit E seem to back that up. In addition, Keller testified, and David's testimony agrees, that on June 17 Keller opened the safe for David and Roxanne so David could take pictures of the gold in the safe. There is no dispute that the gold was there that day. Subsequently Keller and Jensen were locked out of the premises, so Keller's access to the gold was within a fairly narrow time frame. The Court finds that Keller's testimony was credible and that it is quite unlikely that he took the gold or the mining plan.

Roxanne Dotson was at the site on June 17 with her husband David and had the opportunity to view Keller opening the safe and to see the contents. However, her participation in the overall course of events was minimal enough that it is unlikely that she would have ventured down to the site and taken the gold or the mining plan.

Hal Dotson probably had the access to the contents of the safe and to the trailer, albeit through David. However, he was much less often at the site. It is hard to see exactly what the incentive would be for him to take the gold or the mining plan, since he was not the one directly responsible for making the companies (Lessors) successful. And his testimony was consistent enough that it lends credibility to him.

David testified that in early June certain youths affiliated with the Church of Scientology[49] about eight miles away were on the site attempting to collect things that belonged to them. They had a key to one of the gates but apparently did not have keys to get into the storage unit or the office trailer. So they cut the locks on the storage unit and on one or more of the van trailers, and tried to break into the office trailer as well. When David was able to accost them, the youngsters told him that Jensen had allowed them to store some of their possessions there. David let them leave the site and called the sheriff, and the sheriff brought the young men back to the site. The young men specifically identified their possessions, including a saddle, a piano, some beds and some boxes, all of which were in the storage container. Since they had a key to one of the gates and identified their possessions exactly, David and the sheriff agreed that pressing charges was not in order, and the young men left. David then called Jensen and told him what had happened. Jensen did not immediately go to the site. Instead, according to David, Jensen responded that he had given permission to a Molly Baxter and to these young men to store items on the site. David

_____

[49] The name is used the same way David used it; _i.e._, merely as an identifier. Whether the youngsters were in fact associated with the Church of Scientology is not relevant to this narrative and so the Court makes no finding that any Church of Scientology member was involved in the activities alleged by David to have taken place.

said he was extremely upset, that he could not fathom Jensen doing this and this was forbidden by the Lease.

Jensen did not respond to this testimony, so David's testimony is all there is on the subject. But David's account raises some questions. No sheriff's report was produced in support of the testimony, but given the disposition of the matter, it would not be surprising if there were no report. There is nothing in the Lease that explicitly forbids this sort of thing (although David's discomfort is understandable), but that is obviously a minor point. A major point is that there was no testimony that the safe had been even touched, much less tampered with. Surely David, having covered the distance between Socorro and White Oaks in an hour once he received the call about the break-in, would have pressed charges had he thought the young men had taken any gold. And the testimony was that there had been an attempt to get into the office trailer, not that there had been an entry. So presumably the church youth could not have taken the gold or the mining plan. (Besides, one wonders what the youth would want with a mining plan anyway.)

Jensen had both the access and the incentive to take some of the gold for himself, to live on if for no other reason. Despite all his efforts, the mining operation itself was producing very little; indeed, it was almost moribund. Much of his equipment was still little more than junk, and he was not making the

Case 04-15468-s11   Doc 303   Filed 10/13/06   Entered 10/13/06 14:43:48 Page 61 of 74

payments on the leased equipment. His workers were mostly off elsewhere trying to make a living. So little gold had been produced that Carl was not even requiring that it be divided. Sales of gold had brought in penuriously small sums of money. And he was facing the distinct possibility, indeed imminent likelihood, of the announcement that the Lessors were pulling the plug on him.

Jensen's case is not helped by his at least occasional lack of credibility. His inability to get his story straight about whether he kept production records and, if so, where they were, or whether he borrowed money from his son for this project, are only two examples. Others are his responses of "I can't answer that" when he was confronted with a number of questions, such as whether he had money to make certain payments, or whether he had complied with the Lease, or what his production records would say. This Court's clear impression of Jensen was of a person desperately trying to recover something (in fact, everything) from this venture by means of this litigation but unwilling to acknowledge the shortcomings in his case.

Despite all of this, the Court has concluded that Jensen did not take the gold and the mining plan. He was already selling the gold that he had, with the apparent acquiescence of Carl. And were he to be taking gold to sell and pretend someone else had taken it, why not take some of the nuggets and gold dust? In

addition, he would have no use for the mining plan, other than there at White Oaks. It is conceivable that he took the gold and then took the mining plan also as a diversion, but that seems rather more byzantine than Jensen is accustomed to or capable of. And having taken the mining plan is certainly not consistent for someone who, upon being told the plug was being pulled, simply walked away.

That leaves David. He did have access to the safe; on June 17, he and Roxanne specifically asked Keller to open the safe, and in the process were able to see what the two lower combinations were. (The combinations were also kept in the office trailer, which David also had access to.) David said he wanted to take pictures of the gold for Carl, although Carl's actions had made it clear that Carl had been satisfied up to that point with the informal reporting from Jensen. When Keller opened the safe on July 14, David immediately announced, according to Keller, that gold was missing and he knew exactly what was missing. David ended up with some of the records of the project; obviously he had taken them from the office trailer, demonstrating his access to the office trailer and his willingness to take from the trailer what he wanted without informing the owner of the property taken. David's assuming management for the Lessors, as he knew was imminent as Carl got more ill, would require him to make money from the site and to

deal with Jensen, with whom he had far less patience than his
father had.  As soon as his father died, David, either speaking
for his father or for himself as the soon-to-be CEO of the
Lessors, had Don Klein issue the letter terminating the Lease.
He then promptly locked Jensen out.  And after Jensen departed
the site for the last time on July 14, David assembled Jensen's
equipment and began using some if it, including repairing the
dump truck and selling the pickup truck.  David was clearly
convinced that the site could be profitably mined.  Thus he also
had the incentive to have taken the mining plan.

David's incentive for taking the gold is perhaps less clear.
Certainly Jensen being in a position of not being able to account
for all the gold fit in with David's agenda to terminate the
Lease with Jensen.[50]  More likely, David's apparent continuing
belief that the ore being mined, particularly the specimen gold,
was extremely rich, and he wanted to prove it, could have led him
to take that gold rather than the nuggets and gold dust from the
safe for testing or any other purpose.  (One in David's position
would assume that the specimen gold in the safe would be the most
gold-bearing of all the specimen gold on the site.)

Despite pauses to shed (genuine) tears over his father's
death, David's testimony was frequently not credible.  For

---

[50] This conclusion is based in part on David's impatience
with his father's not moving more vigorously or quickly to
enforce the terms of the Lease.

Case 04-15468-s11   Doc 303   Filed 10/13/06   Entered 10/13/06 14:43:48 Page 64 of 74

example, he testified that one photograph showed a six cubic foot bin (3'x2'x1') partially filled with rock that was 80% gold. Even if the amount of rock in the photograph was only, say, one cubic foot, that would constitute many pounds (not ounces) of gold. That raises a significant conflict with Jensen's testimony that at most Jensen mined about 80 ounces of gold from the property.[51] (and that he had 1/4 - ½ ounce of decorative gold for sale in Silver City and about $2100 worth at the Miners' Days at White Oak). It would have made no sense for Jensen to "poor boy" his situation. Jensen had poured his resources into making this mining venture work, and he desperately needed to produce gold for that to happen. Insufficient gold production meant the loss of the Lease. Both Jensen and Carl shared a genuine economic and emotional incentive to find and share as much gold as possible. If Jensen had pounds of gold available to him, why would he have not used it to keep himself operating? Why would he have not told Carl, who never acted as if there were a lot of gold being mined? And why would Jensen have meekly told David and Hal to keep what he had mined in payment of his debts, as David and Hal testified he said?

The same considerations apply to David's claims that Jensen's operation had produced remarkably large quantities of

---

[51] Keller calculated they had produced about 44 ounces altogether, which was definitely not profitable.

Case 04-15468-s11   Doc 303   Filed 10/13/06   Entered 10/13/06 14:43:48 Page 65 of 74

gold and other product. David testified that in the office trailer on July 14, he wrote down a figure of $161,000 that Jensen owed. How he calculated that figure did not come out at trial. But inferring that the figure included the $50,000 for the second year lease, the remaining amount owed on the note (about $8,500), and maybe some miscellaneous other expenses, that would leave about $100,000 owed for royalties. Assuming that virtually all of that $100,000 is attributable to gold at the 12% royalty specified by the Lease, David was calculating, or at least billing Jensen, as if he had produced $833,000 worth of gold.[52] Both the figure and demand were absurd.[53]

As already stated, David's suggested explanation for the missing gold and mining plan is also flimsy. The facts that someone had tampered with the screws on the safe to make it look like a break-in,[54] and that the upper two locks were no longer taped open as Keller testified he usually kept them, are

---

[52] This assumes that none of the advance royalty of $50,000 from either 2001-02 or 2002-03 would be credited against the royalties that David calculated were owed by Jensen. If the $50,000, or perhaps even the $100,000, is added in to the multiplier to calculate the valued of the alleged production, the resulting estimate of the value of production increases by 50% to 100%.

[53] It would be in the Lessors' interest to claim a very high production of gold, so that the amount of the royalty Jensen owed would exceed the $50,000 advance royalty.

[54] Keller's testimony was not that the safe had been broken into, but only that it looked as if someone had tried to break into it (or that it had been made to look that way).

Case 04-15468-s11   Doc 303   Filed 10/13/06   Entered 10/13/06 14:43:48 Page 66 of 74

consistent with someone who had access to the safe.  David also had complete access to the entire site at all times, including during that time that Jensen was locked out.

Lessors argue that if David had taken the gold, he could easily have blamed the theft on the church youth, and the fact that he did not do that suggests he did not take the gold. However, David is clearly clever enough to understand that charging the youth with theft like that would have triggered a significant investigation by the sheriff.  For example, David testified that the sheriff brought the youth back to the site very shortly after David reported the intrusion, so that it would have been clear fairly quickly that a theft charge could not be substantiated.  An investigation would have led away from the youth and inevitably focused attention on David.

Finally, two other items help convince this Court that David is not to be believed.  David filed a voluntary petition under chapter 13 of the Bankruptcy Code on July 26, 2004.  In re David L. Dotson, No. 13-04-15441 MA (Bankr. D. N.M.).  In that case, Judge Mark McFeeley made findings adverse to David in the litigation over claim no. 11 in the case and in connection with the confirmation hearing on David's chapter 13 plan.

Claim no. 11 was filed by four creditors who asserted that David had discharged a firearm over their heads.  David denied in his testimony that he had done so; the claimants testified

otherwise; and the Court found that David had in fact discharged the firearm. The Court entered an order containing findings of fact and conclusions of law denying David's objections to the claims of these creditors. Order Denying Debtor's Objection to Claim No. 11 (doc 92).

> The Claimants refused to leave, stating they did not intend to go anywhere with Dotson and that they intended to continue their hunt. Dotson testified that after the argument, he left the area and contacted the sheriff's office.
> According to the Claimants' testimony, after the argument, Dotson turned around, quickly walked to the passenger side of his ruck and grabbed a rifle while yelling that the Claimants were "going down" and that they were "going to jail." Dotson fired two quick successive shots at a forty-five degree angle above the Claimants [sic] heads, and then swung the rifle down facing the ground.
> After careful review of all of the evidence and the conflicting testimony, the Court concludes that the Claimants have presented the more credible version of the events of that day and, therefore, have proven by a preponderance of evidence that Dotson assaulted them by threatening them with a rifle and by firing a rifle above their heads.

Id. at 3-4, 8.

David's chapter 13 plan (doc 9) came before the Court (Judge McFeeley) on a contested confirmation hearing (doc 91 – minutes). The Court entered an order denying confirmation (doc 93) and a separate memorandum opinion detailing the reasons therefor. Doc 94. As Jensen accurately points out, the Court found reasons to doubt David's credibility:

> ...[T]he availability of funds far in excess of earnings reported by the Debtor in his schedules and statements, and the apparent concealment of the funds

Page 68 of 74

> from the creditors and the Trustee, causes the Court to
> doubt the Debtor's credibility and sincerity in seeking
> Chapter 13 relief.  The Debtor proposed a Plan that
> constitutes an abuse of the Chapter 13 process.  The
> bank statements reveal a Plan premised on distorted
> financial information and clearly lacking in good faith
> as required by § 1325(a)(3).

Id. at 5.[55]

What all the foregoing findings lead to is the conclusion, sadly but easily reached by this Court, that David Dotson has very little credibility.  Nothing David has said during these proceedings is to be believed merely because David said it, but only if there is some other reason to believe it.

It is with some confidence, then, that the Court concludes that it is more likely than not that David broke into the safe to take specimen gold and that he entered the office trailer and took the mining plan.  Of course David did not disclose this to Jensen, and so Jensen, not knowing that David took the items, did not waive any of his rights or claims with respect to the items. Thus Jensen has a conversion claim for the specimen gold and the mining plan.

The question then presents itself as to what compensatory damages has Jensen proved with respect to the gold and mining plan.  The answer is, in one sense, none.  The Court is unable to say, based on the testimony presented, precisely how much

---

[55] Two and half months after the order denying confirmation was entered, David dismissed his Chapter 13 case.  Docs 107 and 108.

Case 04-15468-s11   Doc 303   Filed 10/13/06   Entered 10/13/06 14:43:48 Page 69 of 74

specimen gold was taken[56], or what its value or the value of the

mining plan was.  However, it is clear enough that David did in

fact take Jensen's property.  Jensen put on no evidence about the

value of the gold that was taken, although doing so would be

somewhat difficult since Jensen had no access to weigh and value

it after the theft.[57]  Nor did Jensen put on evidence about what

the value of the mining plan was, although arguably he could have

done so. In consequence the Court can award only nominal damages.

See Sanchez v. Clayton, 117 N.M. 761, 768, 877 P.2d 567, 573

(1994).  The Court therefore awards nominal damages to Jensen of

$20.00 combined for the specimen gold and the mining plan.  In

addition, however, the Court awards punitive damages to Jensen of

$10,000 in connection with the theft of the gold.[58]  These awards

---

[56] Keller's testimony was that a small percentage of
specimen gold in small tubs was taken – around 1/20 of what was
there – together with the low grade practice rock.  Keller also
testified that some specimen gold, flake gold and practice gold
was missing from the trailer, but there was no specification of
this amount either.

[57] By the same token, the Lessors put on no evidence from
which the Court could determine what the amount of the royalty
would be on the stolen gold.  The amount of the unpaid royalty
would be set off against the value of the stolen gold.

[58] In Diviney v. Nationsbank of Texas, N.A. (In re Diviney),
225 B.R. 762 (10th Cir. BAP 1998), the Tenth Circuit Bankruptcy
Appellate Panel addressed the issue of the ratio of punitive
damages to compensatory damages.  In that case, the BAP upheld an
award of $40,000 for punitive damages on an award of actual
damages of $2,850 plus $15,000 in attorney fees.  Id. at 777-78.
The BAP cited BMW of North America, Inc. v. Gore, 517 U.S. 559
(1996) and several Tenth Circuit Court of Appeals cases for the
(continued...)

Page 70 of  74

of damages also compensate for David's trespasses into Jensen's office trailer and the safe. Punitive damages are properly awarded for conduct that is outrageous and needs to be deterred. Madrid v. Marquez, 131 N.M. 132, 135, 33 P.3d 683, 686 (Ct. App. 2001); Northrip v. Conner, 107 N.M. 139, 142, 754 P.2d 516, 519 (1988).

The total conversion damages are awarded jointly and severally against the Lessors.[59] When he converted the non-collateral equipment, the specimen gold and the mining plan, David was acting on behalf of the Corporations. Although it is not clear on what exact date David took the gold and the plan, it was at a time when David had taken over either effective or formal management of the Corporations from Carl. And his taking, using and selling the various pieces of equipment were all after he officially became the CEO for the Lessors on June 29. The

---

[58](...continued)
proposition that under the Due Process Clause, punitive damage awards may not be excessive. Id. at 777. Diviney was a case with specific compensatory damages. In this instance, because David's theft of the gold has made it impossible to calculate the value of the gold, the Court is forced to award only nominal compensatory damages. The Debtors should not be rewarded and Jensen penalized because David so stealthily accomplished the tort.

[59] This claim litigation is not an adversary proceeding. Nor was David made a party personally to this proceeding (even assuming that was possible). In consequence, the Court cannot make David also liable for the tort damages. See Stinson v. Berry, 123 N.M. 482, 486, 943 P.2d 129, 133 (Ct. App. 1997) (both individual and corporation can be liable for the same tortious conduct).

Page 71 of 74

utility of David's actions to the Corporations is obvious with respect to the equipment and the mining plan; for example, there would be no reason to take the plan other than to insure the continuing operation of the site after Jensen left. Taking the specimen gold would help David confirm what the quality of the ore was, also useful for continuing the mining operation. And of course the specimen gold could be sold to pay the bills, as was demonstrated by the Corporations' sales of specimen gold to the New Mexico School of Mines.

Remaining causes of action

From what has been said, it is clear that Jensen has failed to prove the remaining causes of action that he has alleged. The Corporations, acting through David, had the right to lock Jensen out of the property and to gather and prepare his equipment for disposition as collateral for the debts he owed. The Corporations' temporarily cutting Jensen off from access to his equipment in the course of telling Jensen that he had no more right to operate on the site might have constituted a claim had Jensen demanded immediate access to it. He did not do so, most likely because he had no use for it anywhere else. It is true that there was some testimony about other construction projects that required the use of a grader and front-end loader, such as the one on or near Peter Wolf's land, but Jensen did not provide sufficient concrete evidence of other activities or contracts at

which that equipment could have been.  Thus he was not deprived
of the opportunity to earn money from the equipment, and he is
not entitled to damages for the loss of the use of the equipment.

Jensen testified that he had a contract with Lincoln County
for the supply of gravel, but he also testified that the county
had no need of gravel before July 14, so Jensen never sold any.
Therefore there was no loss for which the Debtors would be
liable.  Jensen has no claim for cessation of business, since
Jensen's own inaction and the Lease by its own terms caused the
cessation of the business.[60]  Nor is prima facie tort available
to Jensen; the Debtors terminated the Lease, but did so for
cause.  And the Debtors acted in good faith and dealt fairly with
Jensen with respect to the termination of the Lease, since the
Lease was terminated by Jensen's failure to provide notice of
renewal and to tender the required advance royalty.

## Conclusion

Jensen lost his right to continue operations on the White
Oak site.  On the other hand, he is entitled to be compensated
for the excess collateral that the Lessors took from him and did
not either return to him or dispose of commercially with the
excess funds going to him.  He is also entitled to be compensated
for the theft of the gold and the mining plan.  Those figures

---

[60] By the same reasoning, Jensen has no claim for the loss
of contractual relations or a prospective contract with
Citicapital, First Bank, or the Lessors.

Case 04-15468-s11   Doc 303   Filed 10/13/06   Entered 10/13/06 14:43:48 Page 73 of 74

respectively are $305,607.30 + $10,020.00, for a total of
$315,627.30.  An Order will enter for Jensen on this amount as
his claim as the joint and several liability of each Debtor.


                                    _____
                                    Honorable James S. Starzynski
                                    United States Bankruptcy Judge


copies to:

Michael K Daniels
PO Box 1640
Albuquerque, NM 87103-1640

Alice Nystel Page
PO Box 608
Albuquerque, NM 87103-0608

James A Askew
PO Box 1888
Albuquerque, NM 87103-1888

William R Keleher
PO Box 2168
Albuquerque, NM 87103-2168

Karen Howden Weaver
7430 Washington St NE
Albuquerque, NM 87109-4561